IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 22, 2011

## JERRIE BRYANT v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Van Buren County**
**No. 1959-F     Larry B. Stanley, Jr., Judge**

---

**No. M2010-01954-CCA-R3-PC - Filed October 25, 2011**

---

A Van Buren County jury convicted the Petitioner, Jerrie Bryant, of second degree murder. This Court affirmed the Defendant's convictions, but we vacated her sentences and remanded the case for resentencing. *State v. Jerrie Bryant*, No. M2007-02057-CCA-R3-CD, 2008 WL 544650, *1-13 (Tenn. Crim. App., at Nashville, Feb. 20, 2008), *no Tenn. R. App. P. 11 application filed*. The Petitioner filed a petition for post-conviction relief alleging she received the ineffective assistance of counsel. After a hearing, the post-conviction court denied relief, and the Petitioner now appeals. After a thorough review of the record and applicable law, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and CAMILLE R. MCMULLEN, J., joined.

Jennifer Austin Mitchell, Dunlap, Tennessee, for the Appellant, Jerrie Bryant.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Lisa Zaviogiannis, District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### I. Facts
### A. Trial

On direct appeal, this Court summarized the facts underlying this case as follows:

This case arises from the killing of Furlon Bryant in June 2005, whose body

was discovered on June 13, 2005. The Van Buren County Grand Jury indicted the [Petitioner] on charges of first degree murder and abuse of a corpse in relation to this killing. At her trial on these charges, the following evidence was presented:

Mary Jane Bell, a loan officer for First National Bank in McMinnville, testified the [Petitioner] requested a real estate loan for $35,000 from her on February 4, 2005. The [Petitioner] said that she and her husband were divorcing and that the loan would be used to buy his interest in their house. The [Petitioner]'s loan application was approved that day, but she never returned to complete the loan. When Bell called the [Petitioner] to inquire about this, the [Petitioner] said her divorce had been postponed, and she would call when she needed the loan. On cross-examination, Bell said the bank had extended loans to the [Petitioner] before, and the [Petitioner] always paid them back in accordance with the terms of the loan. Bell agreed that she told the [Petitioner] she would be approved for the loan as long as the house appraised for at least $70,000.

Kenny Moore testified he lived near the Bryant residence, and, on a Monday, June 5, or Tuesday, June 6, 2005, he saw the victim and the [Petitioner] leaving in the victim's truck around lunchtime. Later that evening, he saw the [Petitioner] leaving by herself in the victim's truck. He waved to her, but she did not wave back at him. Moore had lived near the Bryants for ten years, and he had never seen the [Petitioner] drive the victim's truck. Moore then identified a picture of him taken around that time that showed in the background smoke coming from the Bryants' property. Later that week, on Wednesday, he saw the victim's truck parked on the hill.

Willie Pack, the victim's neighbor, recalled that, on Monday, June 5, 2005, he was working in his garden at around noon when his friend, Bill Watts, came by for lunch. As the two were eating on the porch, he heard around twenty to twenty-five rifle shots. He looked but did not see anything. On Tuesday, June 6, 2005, he was leaving to go to church around 6:00 or 6:30 p.m., and he saw smoke behind the little barn at the Bryants' home. He thought it was odd that someone was trying to burn something because the ground was so wet from rain. Sometime later that week, Pack estimated maybe Wednesday, the [Petitioner] asked him where she could borrow $50,000, saying that the victim would move out if she gave him $50,000. Pack recalled a previous occasion when the [Petitioner] told him that she made the mistake of leaving her house once before and that she would never do that

again. On cross-examination, Pack agreed that the shooting he heard sounded like someone was target practicing because he heard several shots bunched together and then a pause as if someone was reloading the gun and then several more shots. Pack agreed that he did not know who was at the house at the time he heard the shots or saw the smoke. Pack testified that he had seen a dark large "camouflage looking" truck go around behind the back of the Bryants' house, which he found odd. Further, on Wednesday, June 7, 2005, he heard several voices coming from the Bryants' house during the night and saw a light flickering at their house. Another neighbor found the victim's truck the following day.

Earl Ramsey McCoy testified he had known the victim all of his life and the [Petitioner] for approximately twenty-five years. He and the [Petitioner] began having an affair in 2004, and McCoy felt he concealed the affair better than the [Petitioner]. McCoy recalled that in May 2005 the [Petitioner] told him that she and the victim had divorced, and she was a "free woman." He made it clear that he did not intend to leave his wife for her.

On Monday, June 6, 2005, McCoy was planting a garden when the [Petitioner], who was walking, appeared at the end of the gate. He asked her what she was doing, and she said she was walking and went farther than she realized. She asked McCoy to take her back to her car, and he complied. McCoy told the [Petitioner] that he could not stay, and the [Petitioner] got angry with him. He said that he had ridden horses with another woman the day before, and the [Petitioner] said "you can spend six (6) hours with that . . . fat bitch, but you can't spend fifteen (15) minutes with me." McCoy apologized but said he had to go back and work. McCoy said that on Thursday, June 9, 2005, the [Petitioner] drove to his farm and told him that she had been to court, and he offered her advice about getting an attorney to assist her in having her house auctioned. The [Petitioner] told McCoy that the victim was going to sell her his half of their marital house for $35,000 and that he left for Montana with no plans to return. On cross-examination, McCoy testified that the victim had been suspicious of him and the [Petitioner] for some time. After the victim learned about the affair, he talked to McCoy, and the two had what McCoy described as a normal conversation with neither of them getting upset. McCoy agreed he kept a gun in his truck but claimed it was only for shooting coyotes.

Two witnesses saw the [Petitioner] purchasing gas at the Highway 30 Market, where the [Petitioner] also worked. Freda Womack, who worked at

3

the gas station, saw the [Petitioner] in the store purchasing gas on the morning of June 6, 2005. Later that day, the [Petitioner] returned and purchased more gas, saying that she was going to mow her yard. On cross-examination, Womack testified it was not unusual for the [Petitioner] to purchase $4.00 or $5.00 worth of gas. Shane Thomas, the owner of the Highway 30 Market, recalled that the Monday before the victim was found, he saw the [Petitioner] in the store at about 4:50 a.m purchasing $5.00 worth of gas, a gallon of Purex, and a container of Spic & Span. She told Thomas that she was going to clean her house before she went to work. Thomas described the [Petitioner] as having on baggy jogging pants, wearing no make up, and looking like she had just awoken. On June 8, 2005, he saw the [Petitioner] in the store again talking to Willie Pack about trying to buy the victim's half of their home. Thomas asked the [Petitioner] where the victim was, and the [Petitioner] "shrugged her shoulders and switched [the conversation to] something else." Thomas testified he saw the [Petitioner] in the market almost every day that week. On cross-examination, Thomas acknowledged that he knew that the victim purchased a .22 Remington rifle shortly before the victim disappeared.

Robin Mooneyham testified she was best friends with the victim's and the [Petitioner]'s daughter, Amanda. In June 2005, she worked at the BP gas station in Piney, which was about eight miles from the [Petitioner]'s residence. She estimated that the Highway 30 Market was approximately a mile and a half from the [Petitioner]'s home. On Tuesday, June 7, 2005, Mooneyham saw the [Petitioner] at her BP station purchasing $10.00 of gasoline. She was driving the victim's Dodge truck, before which Mooneyham had never seen her drive. Mooneyham knew that the victim and the [Petitioner] had recently been divorced and that the two were still arguing over ownership of the house.

Manuel Mooneyham testified that, during the early part of June 2005, he saw a truck parked at his brother's house at around 6:00 a.m., which was unusual. He called his brother, Monroe Mooneyham, and told him about the truck. Monroe Mooneyham testified that the last time he saw the victim was about a week before his disappearance when the victim borrowed $100.00 from Mooneyham. Monroe Mooneyham said Manuel called him and told him that a truck was parked on his property. Monroe was out of town and saw the victim's truck upon his return. He observed that the truck looked as if it had been parked in that spot for a while. The driver's side window was about halfway down, and it had rained that day, so there was water in the back of the truck. Mooneyham looked for the victim, thinking he may be nearby, but did not see him. He went home and called the Bryants' residence, and Amanda

4

answered and told him that she had not seen the victim in a couple of days. Mooneyham told her about the truck, and Amanda met him to look at the truck. While they looked at the truck, the [Petitioner] drove by at least three times in her maroon car. Mooneyham had never seen the [Petitioner] drive the victim's truck. After discovering the truck, Amanda called her sisters, and eventually the police came to investigate the truck. On the following Sunday, Mooneyham assisted deputies looking on his and the Bryants' property for the victim, but they did not find him. While looking, he detected a "foul" odor, and one of the deputies told him that a snake was hanging in some wire or brush.

On cross-examination, Mooneyham said he found the victim's truck in an area clearly visible from the road. He said that had someone wanted to hide the truck they could have easily driven further onto the property, which led to a large field. He agreed that the victim occasionally hunted on the property.

Larry Sullivan testified that he knew the [Petitioner] and that he saw Monroe Mooneyham two or three weeks before the victim's death. He said that the victim was "out of money" and came to his house. The two then went to Robinson's grocery where they saw Mooneyham. The victim borrowed $100.00 from Mooneyham. Sullivan said he last saw the victim on Monday, before the victim disappeared. The victim was at Sullivan's house, and Sullivan described the [Petitioner] as acting normal. On cross-examination, Sullivan said he lived near Danny Bentley, and Bentley would sometimes come to his home. Sullivan said that he was present when the victim talked about going to Montana and that, if the victim went, Sullivan was going to go with him. On redirect examination, Sullivan said there was no set departure date for Montana.

Patricia Messenger testified that she employed the [Petitioner] for six years to clean her house, and Messenger always furnished the cleaning supplies. The week that the victim disappeared, the [Petitioner] was supposed to clean her house on Tuesday, June 7, 2005, but she never arrived. Messenger saw the [Petitioner] on Wednesday around noon at Wal-Mart. The [Petitioner] honked her horn at Messenger, waved, and then came over to her to have a short conversation. The [Petitioner] told her that she had been cleaning for another client, Jo Cawthon, and that she was going into Wal-Mart to purchase supplies. She did not mention any plans that she had for that afternoon. Messenger described the [Petitioner] as looking tired, and the [Petitioner] said she had been sick.

5

Messenger was aware that the [Petitioner] and the victim recently divorced. The [Petitioner] told her that the divorce decree ordered the house to be split fifty-fifty, and the [Petitioner] seemed happy about that fact. Leading up to the divorce, the [Petitioner] had discussed the situation with Messenger, and she told Messenger that she was not having an affair but that the victim was saying that to cause trouble for her. Messenger later discovered that the [Petitioner], whom she considered a good friend, was in fact having an affair. Messenger recalled one time when the [Petitioner] told her that she would get angry and would not remember some of the things that she did.

On cross-examination, Messenger said the [Petitioner] had always done a good job for her, and she described the [Petitioner] as "a good Christian girl." The [Petitioner] did not smoke, drink, or curse. She dressed appropriately, and Messenger trusted her. Messenger said she and the [Petitioner] were good friends, and they would workout at night together at the YMCA. She never saw the [Petitioner] flirt or talk to another man at the YMCA. Messenger encouraged the [Petitioner] to lose weight, which the [Petitioner] did. Messenger recalled that, when they finished working out at night, they would sometimes go to Wal-Mart together. Messenger testified that, if the [Petitioner] was sick, she would not want the [Petitioner] to come to her home because her immune system was poor.

Messenger recalled a time that she took the [Petitioner] to Women in Crisis, and she saw marks on the [Petitioner]'s back and arms and the [Petitioner]'s blackened eye. After being at Women in Crisis, the [Petitioner] moved in with Messenger for around two months, and then Messenger helped her find a little place to rent. Messenger also testified that Larry Sullivan came to her house, but her husband told him to leave. The victim made threatening phone calls to her, which she reported to the sheriff. The sheriff told her that she would have to go back to the sheriff in her home county and get a warrant from him, and the sheriff would serve it on the victim. On redirect examination, Messenger seemed to contradict her earlier testimony by saying that the victim never threatened her, but he blamed her for his divorce.

Jo Cawthon testified she met the [Petitioner] at the "Y" in Sparta, sometime after which the [Petitioner] began cleaning Cawthon's house. She said that she furnished the cleaning supplies for the [Petitioner] to use and that the [Petitioner] cleaned her house on June 8, 2005. The [Petitioner] arrived at around 10:00 a.m., which was normal. The [Petitioner] stayed for two to three hours, and Cawthon requested that the [Petitioner] stay longer to help her clean

6

the windows.  The [Petitioner] told Cawthon that she had an appointment with her attorney to discuss whether she should pay her husband half of what he wanted for the house or have the house appraised.  She told Cawthon that she would return the next day, but she never did.  Cawthon had not spoken with her since that day.  On cross-examination, Cawthon said that she never saw the [Petitioner] trying to "pick up" men, and she described the [Petitioner] as acting "very professional."  She said she trusted the [Petitioner] "very much."  Cawthon said the day the [Petitioner] came to clean her house, she acted perfectly normal.

Emma Scott testified that the [Petitioner] was her mother, and, while the victim was not her biological father, he had lived with them since she was two years old.  Scott testified that the victim was like a father to her, he was good to her, and he was always there for her.  She kept in touch with the victim up to the time of his death, but she had not spoken to the [Petitioner] in over a year.  Scott said that, at the time of the victim's death, he and her mother were recently divorced and still contesting who would retain their marital home.

Scott recalled that she saw the victim two or three times per week, and she last saw the victim alive on the Friday before his death when he loaned her his lawnmower.  She did not hear from him the following week, which was unusual, but she was not concerned, thinking he was trying to reconcile with her mother. On Thursday, June 9, 2005, her step-sister, Pam McDonald, called her and said that she had not seen the victim either.  The two went to look for the victim's truck, and they found it down the road from the victim's marital home at another house.  When she saw the truck, she noticed two things: the window was left open despite that it was raining; and the seat was pushed forward as if someone short had driven the truck.

Scott testified that on June 10, 2005, around 5:00 or 6:00 p.m., she heard over her EMS scanner that there was a problem at her parents' home.  She went there, where she saw her mother being placed into an ambulance.  She noticed that the little door in the basement that led under the house was open and that the gun, a .22 rifle, was standing up between the washer and dryer.  Shells were lying on top of the washer and dryer and on the floor; the clip was lying on the dryer.  Scott went to see her mother in the hospital, and her mother told her that she was "sorry."  Scott assumed that her mother was apologizing for their not speaking in over a year.  While in the hospital, the [Petitioner], who only recognized Scott at times, kept saying "I shot the gun one time."  She also said, "[H]e shot the gun twice by my head, so I shot him."

7

While in the hospital, the [Petitioner] hallucinated and told Scott to look at her neck because a snake had been biting her on the neck. Scott said that the [Petitioner] said this "before her mind c[a]me back to her." The [Petitioner] admitted she burned the old couch that they found in the burn pile.

On Sunday, June 12, 2005, Scott went back to the victim's home to try to discover clues to help find the victim. Scott's sister, Amanda, recalled that the [Petitioner] had burned an old couch, and Scott went to the burn pile with Amanda and Amanda's boyfriend, Chad Turpin, and others. In the pile, they found the victim's pants, billfold, and cowboy boots. Scott called the police to report what they found in the pile. The following morning, Scott assembled a search party to search the woods around the house, where they found the victim's body. Scott said that a dead snake was found on top of the pile where the victim's body was found, and the [Petitioner] later said that she had killed the snake by the horse barn. Scott returned to see the [Petitioner] in the hospital to tell her that the victim was dead. When she did so, the [Petitioner] acted "empty" and did not cry or scream at the news.

Scott identified suicide letters that her mother had written in March 2005, before the murder, which the victim gave to her. In those letters, the [Petitioner] said to the victim, "I want to be cremated. This is my last wish. As hard as it will be for you, I am sorry to ask you, but please give my ashes to Ramsey. He knows what I want done with them. I don't want a service or flowers or any tears. I am sorry."

On cross-examination, Scott testified that the [Petitioner] always kept their house clean, provided food for them to eat, and kept them nicely clothed. Scott said the [Petitioner] moved out of the house when she and the victim got into a "big fight." Scott described the incident leading to her estrangement with the [Petitioner] saying that, after the house the [Petitioner] rented at this time burned down on Mother's Day, Scott went to the site where the [Petitioner]'s house had been. There, she told the [Petitioner] in front of the victim that the [Petitioner] acted like a "whore" in Wal-Mart. Scott imitated the way her mother walked in Wal-Mart, and the [Petitioner] asked Scott to leave. The two had not spoken from that day until she visited her mother in the hospital. Scott testified that the [Petitioner] began a relationship with McCoy before the [Petitioner] and the victim divorced in May of 2005. While the [Petitioner] and the victim were having marital problems, the victim began to engage in social activities with his old friend Larry Sullivan. Scott said she searched the home after the [Petitioner] was hospitalized and found no bullet

8

holes.

Amanda Bryant testified that, in June 2005, she lived with the victim and the [Petitioner], who were her parents, even though her parents had recently divorced. The last time that she saw the victim alive was Sunday, June 5, 2005, at about 8:30 or 9:00 p.m. The next day, she saw the [Petitioner] sweeping the carport. She noticed that the couch usually located on the carport was missing, and the [Petitioner] said she dragged the couch away because it was covered in fleas. The [Petitioner] had never mentioned before that there was a problem with the couch. Bryant later found the couch in the burn pile.

Bryant recalled she did not see the victim for the next two days, and the [Petitioner] told her on Wednesday that the victim came home with a lot of money and tried to give her $100. The [Petitioner] said she refused the money, and the victim packed his things and said he would be gone for two weeks. The [Petitioner] also indicated to Bryant that the victim said if he was not "back, to give the money for the house to his mama." Bryant later learned, on June 9, 2005, that the victim's truck had been found at one of his good friend's house. Bryant noticed that the windows of the truck were rolled down, despite the fact that it had been raining, that there were no keys in the truck, and that there was a liquor bag and some Tic Tacs in the truck. Bryant told the [Petitioner] about the truck, and the [Petitioner] said that she did not know, or care, about the location of the victim.

On June 10, 2005, Bryant came home and found the [Petitioner] with "[h]er eyes . . . bugged out of her head and . . . shaking real[ly] bad." Bryant asked if the [Petitioner] was okay, and the [Petitioner] responded that she was fine. Bryant went into the restroom and saw that someone had thrown up there, and she saw two pills on the floor by the sink. Bryant got some clothes and then she left the house and went to the home of her boyfriend, Chad Martin. Bryant and Martin returned to check on the [Petitioner], only to learn the [Petitioner] had overdosed and was being taken to the hospital.

Bryant went to the hospital to see the [Petitioner], and the [Petitioner] appeared to recognize her. Bryant recalled that the [Petitioner] said that she saw the victim's ghost at the foot of her bed. The [Petitioner] also said, "[Y]ou will get the money," which she interpreted to mean that her father was no longer "around." After the [Petitioner] was transferred to another hospital in Nashville, Bryant again went to see her, at which time the [Petitioner] said, "[H]e shot the gun twice and I shot him." She was also talking about snakes

9

and butterflies coming out of Bryant's eyes, but she did recognize Bryant, calling her by name.

Bryant said that she and her sister, Scott, returned to the [Petitioner]'s and the victim's house to see if they could find anything to help them figure out what had happened. They looked outside together and went down to the "burn pile" where they found the victim's boots, his wallet, a piece of his pants, and a blue lead rope that he usually kept in the barn. Bryant went downstairs, and she noticed that, since she had been there at around 12:30 p.m., the washer and dryer had been pulled out from the wall, and the board that blocked the crawl space had been removed. She saw the victim's rifle leaning against the washer and a couple of shells on the washer. Bryant recalled that the victim did not keep the rifle and the ammunition in the same place in the house, and only she, the victim, and the [Petitioner] knew where they were kept. The following day, she returned to the house with her boyfriend and other people, and she learned that a search party had discovered her father's body.

On cross-examination, Bryant conceded that she rarely stayed at her parents' house. She reiterated that her mother said that she was going to burn the couch, but she did not see any drag marks from where the couch was located to the burn pile. Bryant recalled that the victim discussed going to Montana before his death. Bryant testified that the victim had been drinking during the time before his death and that she had argued with the victim when he came home after drinking. Bryant said that she had never seen her mother drive the truck. Bryant said that the [Petitioner] did not struggle financially and had recently given her $1200. She thought the [Petitioner] would do anything for her and her sister.

Mark Evans, a Deputy Sheriff for the Van Buren County Sheriff's Department, testified that, on June 13, 2003, he responded to a call reporting the discovery of the victim's body. Deputy Evans contacted the District Attorney General's Office to assist, and then he secured the scene with Deputy Chris Russell.

Deputy Russell testified that he responded to the call in this case that there had been an attempted suicide at the [Petitioner]'s home. When he arrived, the [Petitioner]'s daughter, Amanda Bryant, informed him there was a .22 caliber rifle in the house, which he removed from the home in accordance with the police policy of removing weapons from the home of an attempted

10

suicide victim. Deputy Russell took the rifle and placed it in the trunk of the car of the [Petitioner]'s other daughter, Amanda Scott. The following Sunday, he responded to another call from the Bryants' house, and, when he arrived, several family members and friends were there claiming that they had found the victim's remains in the burn pile. From the burn pile, he retrieved boots and a wallet that he bagged and turned into Deputy Rowland. On Monday, he responded to a call from the Bryants' home that human remains had been found. He confirmed the presence of human remains at the house and subsequently taped off the area. On cross-examination, the deputy testified that his investigation of this case began the day before he received the suicide call, when he was called to investigate the victim's truck. He said the victim's truck was found at the victim's friend's house, and, in the truck, he found a piece of paper indicating that the victim had meetings at a mental health facility.

Steve Turpin testified that he lived with Emma Scott, the [Petitioner]'s daughter, and he responded as a fire fighter to a call about the victim's truck on June 9, 2003. They found the truck at the victim's friend's house, which was a short distance from the victim's house. The following day, he responded to a 911 call while he was riding in a car with Deputy Russell. At the house, Deputy Russell gave him a rifle from the house, which he put in the trunk of Scott's car. When they discovered the victim's remains on June 13, 2003, he got the rifle from the trunk of his car and gave it to Jason Rowland. On cross-examination, Turpin testified that he was at the [Petitioner]'s home after the [Petitioner] was taken to the hospital and before the victim's body was found.

Jimmy McCormick testified that his friend asked him to help look for the victim, which he did with the assistance of Ricky Sanders. He said that he smelled what he thought to be a decaying human body. He followed that smell to a brush pile, and, near it, he saw a leg and foot. He then called 911. The 911 dispatcher testified that she received this 911 call at 10:34 a.m. on June 13, 2003.

Frances Marie Wheatley, the chief investigator for the Davidson County Medical Examiner's Office, testified that she went to the site of the victim's remains, which had been taped off by police. Wheatley testified about multiple photographs of the area around where the remains were found, and those pictures were displayed for the jury. The pictures depicted multiple tree limbs and skeletal bones lying in and around the brush pile. Wheatly recounted that the brush pile was covered with deer netting, and the netting

11

had caught a snake, which subsequently died and was decomposing. In the brush pile, she found more skeletal remains, some of which were charred. Wheatley testified that she was able to remove the remains predominately in tact, but underneath the body she found other bones that had been pulled away from the body. Wheatley testified that she did not find the right lower leg or foot. The doctor gathered dirt from the scene for later examination, and she found three projectiles in the dirt. When she examined the body, she found that the victim's right femur had been fractured, along with both collarbones, the mandible, the scapula, and the left humerus. She also noticed charring on the jaw bone, the left leg, the left hand, and the pelvis. On cross-examination, Wheatley testified that she was not accusing the [Petitioner] specifically of inflicting these injuries.

Mark Martin, an investigator with the Warren County Sheriff's Department, testified he assisted in this investigation. He found a blue lead rope for a horse near the burn pile, and he collected this rope. Investigator Martin also collected a bleach bottle, a jacket, a pair of coveralls, and a burned shovel from near the burn pile. On cross-examination, the investigator agreed that there was no blood found on the burned shovel. Further, he said that the couch, located ten or fifteen yards from the porch of the house, appeared heavy enough that he would not want to carry it by himself.

Jason Rowland, an investigator for the District Attorney's Office, testified that the victim's family members and friends were concerned when the victim's truck was found at a neighbor's house whose name was Hillis. He went with some other investigators to Hillis's house, and he noticed that the truck looked like it had been parked there for awhile. He noticed that the seat in the truck was pulled "way forward," but he and the other investigators did not find anything when they searched around the truck. They proceeded to the victim's house to talk to the [Petitioner]. He knocked on the door several times but left after getting no response. At the house, Rowland noticed that the lawn needed mowing, and he learned later through his investigation that the [Petitioner] had purchased gasoline to mow the lawn, but she never mowed the lawn. He also noted that, on the back deck of the home, there was a candle sitting on a propane tank, which he opined could be dangerous. Rowland went back to look inside the truck, where he found two pill bottles, both belonging to the victim, in a bag on the front seat. He also found two appointment cards from Cheer Mental Health, at least one of which was for the [Petitioner].

Rowland identified multiple pictures of the crime scene that were taken

after the victim's body was found. Additionally, he testified that the distance between the victim's body and the house was ninety-nine feet. He said there were multiple bleach bottles in the burn pile, and he said there were no bleach bottles inside the house. In a wastebasket in the laundry room, Rowland found two pillows that went with the couch in the burn pile. In a trash bag, Rowland found among other items a divorce decree dated May 24, 2005. On one of the back decks, Rowland noticed that some of the wood had mold or mildew growing on it and another part of the deck did not. He opined that bleach had been poured on the part of the deck that was clean. Inside the [Petitioner]'s car, he found a bag containing an unopened gallon of Clorox bleach. In the [Petitioner]'s purse, he found several receipts showing she purchased bleach from different stores. He also found an appointment card for a mental health appointment on June 9, 2005. In the burn pile, Investigator Rowland found portions of a bed sheet that had been burned around the edges, and the sheet appeared to be from the victim's bed. Rowland testified that he sifted through the dirt at the bottom of the burn pile to obtain a sample to be tested for accelerants.

On cross-examination, Rowland testified that he looked for bullet strikes or holes in the house but found none. He also did not see any fresh paint or any new carpet in the home. Rowland thought that the [Petitioner] moved the victim's truck from their house to where it was later found. He also thought the [Petitioner] moved the couch by herself from the house to the burn pile, and he opined she did so to cover the victim's body. Rowland said he found three gas containers at the house, but the couch in the burn pile was not covered in gasoline. Rowland said that, although he thought the [Petitioner] dragged the couch, there were no drag marks from the house to the burn pile, but the rain and the grass growth could have covered any drag marks. Rowland testified that one witness told him that a man named Tim Guy had said that the victim parked his truck down the road at a friend's house to sneak up on the [Petitioner] and catch her with another man. He attempted to talk with Guy several times but was unable to locate him.

Rowland testified that he believed that the [Petitioner] killed the victim sometime during the week before June 13, 2005, and that she did so in order to get the house. He said that he thought the [Petitioner] beat the victim with the shovel in order to break his bones. Rowland testified that one of the victim's legs was never found, and he did not know what the [Petitioner] did with that leg. He thought the [Petitioner] took the body to the burn pile, attempted to burn it, but was unable to fully burn the body. She therefore

covered the body with the couch and then moved the body to where it was found at a later time. The couch had mud only on the back portion, and he thought it could have been dragged to the burn pile on that side.

Jim Hartman, an investigator with the Warren County Sheriff's Department, testified he assisted removing the victim's body from the brush pile. He also examined the couch in the burn pile and did not find any insects on the couch. Investigator Hartman testified that he searched inside the house for blood or bullet holes but found neither. The investigator said that he found multiple .22 caliber brass shell casings near the surface of the burn pile. He opined that, because they were near the surface, they had not been there long. On cross-examination, he said that he did not send the shell casings to be tested for fingerprints.

Danny Bentley testified he met the victim through the victim's daughter, Pam. He had known the victim for three or four months, but they only socialized together at Pam's house. Bentley said he had only been to the Bryant residence once and that was after the victim's body had been found. He went there with Pam and her husband, and they left after she saw where the body had been discovered. On cross-examination, Bentley testified he lived close to a man named Larry Sullivan, and he knew Tim Guy. He agreed that Guy had a blackened eye around the time that the victim went missing.

Tim Guy testified he knew the victim through the victim's daughter, Pam, but he did not socialize with the victim. He said he had never been to the victim's home, and he had never been in a fight with the victim. Guy stated that the blackened eye he had around the time the victim went missing was not a result of a fight with the victim. Moreover, he denied any involvement in the victim's murder. Guy recalled a time when, after the victim's disappearance, he was at Bentley's house using methamphetamine and the two discussed what may have happened to the victim. On cross-examination, Guy testified that, at the time of the victim's death, the truck that Guy drove was painted "camouflage." Guy said he did not tell Bentley what happened to the victim, and he denied telling Bentley's girlfriend that the victim parked his truck down the road so that he could sneak up on the [Petitioner]. He also denied saying that he would look for the victim about 200 feet from the victim's truck because "he probably got out [of the truck] and was going to sneak up on [the [Petitioner]], and was drinking, and fell in one of those holes up there . . . ."

Lindsey Selby testified she knew the victim and the [Petitioner] because

14

she had been friends with their daughter, Amanda, for five or six years. She said she and Amanda took some target practice at the Bryants' home in 2005, and they were joined by the victim and the [Petitioner]. She and the victim both shot a .9 millimeter, and the other two shot a .22 rifle. On cross-examination, Selby testified she lived with the Bryants for a period of time, and she never saw the [Petitioner] act aggressively toward the victim. She stated she was not implicating the [Petitioner] in this crime.

Cindy Thomas testified that she owns the Highway 30 Market, where the [Petitioner] worked, and she also owned Westwood Market, where the victim worked at one time. The [Petitioner] worked for her in July 2004. Thomas testified she had been to the Bryants' home multiple times, and, one time, she helped the [Petitioner] arrange some furniture. While she was there, they decided the [Petitioner] needed to move a buffet out of the room. Thomas told the [Petitioner] the buffet was too heavy for the [Petitioner] to move by herself, and the [Petitioner] responded that it was "no big deal" and that she moved furniture by herself all the time. The [Petitioner] told Thomas that she could put the furniture on a rug and "move it anywhere" she wanted to move it. On cross-examination, Thomas testified she was aware that the [Petitioner]'s tires had been slashed while she was working.

Sharon Lawson testified she owned Campaign Market, where the [Petitioner] also worked. She knew the [Petitioner] from this and from going to church together. Lawson testified she and the [Petitioner] had a conversation about divorce two or three years before the [Petitioner]'s trial, during which the [Petitioner] said she would see the victim dead before she gave him the house. On cross-examination, Lawson testified that she did not call police because she did not think that the [Petitioner] was actually going to kill the victim.

Several special agents, who worked as forensic scientists for the Tennessee Bureau of Investigations ("TBI"), testified about items from the crime scene that they tested. Hoyt Eugene Phillips, a TBI latent fingerprint expert, testified that he could not always obtain fingerprints from every crime scene he processed because gathering prints depends on the texture of the surface and the environmental conditions present. After processing multiple items in this case, Agent Phillips only found three latent fingerprints, which were on pieces of paper from the victim's truck. He could not identify or match any of the prints that he obtained. On cross-examination, Agent Phillips agreed he might have been able to obtain prints from the divorce papers found

15

in the trash, but those were not submitted to him for testing.  Brad Everett, in the serology DNA unit, tested several items and did not find the presence of blood on any of them.  He explained exposure to fire would destroy any DNA evidence on an item.  Randall Kirk Nelson, with the TBI microanalysis unit, testified as an expert in identification of accelerants and fire debris.  He tested the victim's boots, underwear, pants and belt, and soil from the burn pile.  On all the items tested, Agent Nelson found the presence of evaporated gasoline.  Shelley Betts, a firearms identification expert, testified that she compared a Ruger automatic .22 long rifle with three fired bullets found under the victim's body.  She determined conclusively that one of the bullets was fired from the rifle.  The other two bullets were damaged by the fire, but she said the grooves were consistent with the rifle.

Dr. Hugh Berryman, a forensic anthropologist, testified he viewed the remains in this case on June 15, 2005.  He said the remains still had soft tissue on them, which was removed before he examined the bones.  He determined from his examination of the bones that the victim was a white male, approximately forty to sixty-five years old at the time of death.  The doctor opined that the victim was approximately 5'11" tall.  Dr. Berryman explained that there was trauma to the victim's bones from three gunshot wounds and in the form of blunt trauma, which he termed "sharp or hacking" trauma.  The doctor explained the blunt trauma that he found, saying that there were multiple impacts to the body and describing those impacts in detail.  He described how some of the impacts from the blade, which was 12/100 of an inch in width, slit open the bone and some of the hacking marks appeared to have been an attempt to dismember the body.  The doctor also noted that some of the bones showed evidence of being burned.  He also said that the bones of the lower right leg and right foot were missing completely.  He determined that most of the blunt force trauma occurred around the time of the victim's death.  Some of the blunt force trauma, the trauma to the ribs and the right thumb, occurred before death.  These injuries, he said, could have been caused by a female or a male.

Dr. Stacy Turner, the medical examiner, testified that the victim died as a result of multiple gunshot wounds.  She also noted that the skeletal remains showed injuries from being struck with a blunt object and injuries from heat or fire.  On cross-examination, Dr Turner said that there was enough evidence on the body that she successfully obtained a DNA sample.

Barney Evans, Chief Deputy for the Van Buren County Sheriff's

16

Department, testified he went to the victim's house on June 10, 2005, to see if the [Petitioner] had heard from the victim. When he walked up to the front door, the wooden door was open, and he could see the [Petitioner] lying on the couch. He knocked on the door and she did not move, so he knocked harder until she awakened. Deputy Evans said the [Petitioner] stumbled over a chair on her way to the door and fell to the floor, eventually opening the locked glass door. The [Petitioner]'s speech was slurred, and he thought that she may have had a stroke, so he called for an ambulance. When EMTs arrived, the [Petitioner] told them that she had taken some pills. On cross-examination, Deputy Evans said he knocked on the door for fifteen or twenty minutes before he could arouse the [Petitioner]. Deputy Evans agreed he had been to the Bryant home two weeks before to arrest the [Petitioner] for filing a false police report about a domestic argument. That was, however, not the first time he had been called to the home because of fighting. Deputy Evans testified that he and the victim were friends, and he agreed that he never investigated Tim Guy.

Two nurses from the hospital where the [Petitioner] was admitted testified about statements the [Petitioner] made while hospitalized as the result of her overdose. Nurse Brenda Watts testified that the [Petitioner], who appeared to be hallucinating, looked at some visitors and told them that they needed to go find her husband because she thought that she killed him. On cross-examination, she also said that, shortly after making this statement, the [Petitioner] went into a seizure and then into a coma and was admitted into the Intensive Care Unit. Nurse Susan Cathart, a nurse in the Intensive Care Unit, testified that, at around 12:30 a.m. that night, the [Petitioner] began hallucinating and said that she wanted to get out of bed. The [Petitioner] told Cathart that she saw spiders or "thousand-leggers," and the nurse told her there were no spiders and to lie back down. At around 4:00 a.m. the [Petitioner] started yelling at her husband, the victim, telling him to "take the bullets out of [his] head and put [his] brains back in." The nurse asked the [Petitioner] where her husband was, and the [Petitioner] said he was in heaven as the result of a heart attack and had been there for three or four days. Cathart said that the [Petitioner] became more and more aggressive and kept screaming that she was trying to get back to her husband, who was in heaven, and that her husband was an angel. The [Petitioner] was upset with the nurse for not letting her get back to her husband. The [Petitioner] attempted to pull her IV out and leave, used obscene language, and threatened to kill the nurse. The [Petitioner] was subsequently transferred to another hospital for further care.

*State v. Jerrie Bryant*, No. M2007-02057-CCA-R3-CD, 2008 WL 544650, *1-13 (Tenn. Crim. App., at Nashville, Feb. 20, 2008) (footnotes omitted), *no Tenn. R. App. P. 11 application filed*. Based on this evidence, the jury convicted the Petitioner of second degree murder, and the trial court sentenced the Petitioner to twenty years in the Tennessee Department of Correction.[1] This Court affirmed the Defendant's convictions, but we vacated her sentences and remanded the case for resentencing. *Id*. at *18-19.

## B. Post-Conviction Proceedings

The Petitioner filed a petition for post-conviction relief, and the trial court appointed counsel. The Petitioner amended her petition to allege that her trial counsel was ineffective because he: (a) failed to move for a change of venue; (b) failed to properly investigate the Petitioner's case by not furnishing a jury list to the Petitioner, not timely subpoenaing witnesses, and not allowing the Petitioner to review the evidence before trial; © improperly advised the Petitioner against testifying and thereby failed to present a defense; (d) failed to challenge jurors Vivian Measles and Allen Bouldin; and (e) failed to present the testimony of the Petitioner's sisters and Van Buren County Deputy Barney Evans, whose testimony the Petitioner argues would have supported the Petitioner's innocence.[2]

A hearing was held on the Petitioner's petition, during which the following evidence was presented: the Petitioner's trial counsel ("Counsel") testified that he had participated in thirty-four jury trials before he represented the Petitioner and that in four or five of these trials his clients were charged with first degree murder. He estimated that he traveled to Van Buren County between seventy-five and one hundred times in order to prepare for the Petitioner's trial.

Counsel testified that he investigated the Petitioner's claim that Rex Martin was telling people he murdered the victim but that he found nothing to corroborate this claim. He confirmed the Petitioner told him that two men had attacked her and forced her to swallow the pills that caused her to overdose shortly after the victim's death. Counsel

---

[1] In the Petitioner's first direct appeal, we remanded the case for a resentencing hearing and entry of an amended judgment pursuant to that hearing. That amended judgement was not attached to petition for post-conviction relief and was not included in the post-conviction record. The face of the Petitioner's post-conviction petition reflects that upon resentencing she was sentenced to twenty years at thirty percent. For purposes of this appeal, we will assume that is accurate.

[2] We omit the allegations contained within the Petitioner's amended petition that she does not maintain on appeal.

recalled that the Petitioner said she did not wish to testify at her trial because she did not want to be cross-examined. Nonetheless, Counsel prepared the Petitioner, in the event she changed her mind, to testify at trial by asking her questions the State might ask about the night she overdosed. Counsel said he did not understand why the Petitioner would not testify but recalled that she refused to testify and became "increasingly not willing to take the stand as th[e] case progressed."

Counsel acknowledged that various news sources in Van Buren County covered the events leading up to the Petitioner's trial. He testified that he and the Petitioner discussed whether to request a change of venue, but he recalled that the Petitioner wanted to be tried in Van Buren County. According to Counsel, the Petitioner believed that, because many people in Van Buren County knew that her ex-husband physically abused her, they would be sympathetic to her. Counsel testified that he spent a significant amount of time getting to know members of the Van Buren County community in order to "get a read" on their feelings about the Petitioner's case.

Counsel acknowledged that, by the first morning of trial, he had not served Billy Sandell, Barney Evans, and Chris Russell with subpoenas. He confirmed that a fingerprint had been lifted from a makeup case recovered in the course of the investigation and that the Tennessee Bureau of Investigation did not test the fingerprint. He denied that the Petitioner asked him to hire an independent fingerprint expert to analyze the print.

Counsel confirmed that he received a list of potential jurors before trial and that he went over this list with the Petitioner to determine whether she had a relationship with any of the jurors. He testified that the Petitioner never indicated before trial that she had any "problems" with jurors Allen Boulden and Vivian Measles. After the jury returned a guilty verdict, however, the Petitioner asked Counsel to file a motion for new trial based upon Mr. Bouldin and Ms. Measles's being seated as jurors. Counsel could not recall the Petitioner's reason for believing the jurors should not have been seated, and he did not believe the jurors' participation was harmful to the Petitioner. He raised the jurors' inclusion as error in the motion for new trial, but because he perceived no harm from their inclusion, he did not argue during the motion for new trial hearing that their inclusion constituted error.

Counsel testified that the Petitioner's sister, Patsy McCormick, did not want to testify at her sister's trial, though she was in constant communication with the Petitioner and Counsel. Counsel recalled that they ultimately decided not to call McCormick to testify because the jury might infer that the Petitioner had something to hide if the Petitioner's sister but not the Petitioner testified. Instead, they elected to put on no proof at all and argue that the State had failed to prove its case beyond a reasonable doubt. He recalled that, had McCormick testified, she would have said she saw the net, which was later found with the

19

victim's body, in the Petitioner's yard during the time when the Petitioner was hospitalized for her overdose.

Counsel testified he considered calling Gail Potter, also the Petitioner's sister, to testify but ultimately decided that, because Potter "would have been nervous about being put on the stand for any purpose," she was less "stable" than her sister Patsy McCormick.

On cross-examination, Counsel said that he spent hundreds of hours preparing for trial and that he canvassed very remote parts of the county searching for witnesses. He testified that he "believed in" his client and that, as a consequence, he followed every possible lead she gave him in terms of preparing a defense for her trial. Counsel testified that, at the time the jury was empaneled, he had information that Measles had worked with someone involved in the case twenty-five years prior to trial but that he knew of nothing that made Measles unqualified to sit on the Petitioner's jury. Counsel explained that he objected to Juror Measles and Juror Allen Bouldin's inclusion on the jury in the motion for new trial only because the Petitioner asked him to do so after the jury returned its guilty verdict.

The Petitioner testified that Counsel visited her "about five" times in preparation for trial. She said the two discussed trying the case in another county, but Counsel was "dead set" on trying the case in Van Buren County, though the Petitioner and her sisters were "dead set" against having the trial in Van Buren County. She explained that her sisters had made her aware of the extensive amount of pre-trial coverage her case had received in the local press. She said she went along with the decision to not request a change of venue because she "thought [she] had to do what the lawyer wanted [her] to do." She claimed Counsel told her "there [was] bound to be somebody" in Van Buren County who liked her.

The Petitioner claimed that, during jury selection, she informed Counsel that Juror Measles had previously worked with the victim's nephew and that Juror Bouldin's son was a Van Buren County jailor. Also, the Petitioner felt that Bouldin was "incompetent" because he "sat and talked to himself." The Petitioner testified that she asked Counsel to remove these jurors from the panel.

The Petitioner testified she asked Counsel to call Patsy McCormick, Gail and Steve Potter, Diana Powell, George Delong, and Pat Messenger to testify at her trial. She said Counsel told her that her sisters did not want to testify on her behalf.

The Petitioner said that, from the outset of her trial, she and Counsel had prepared for how she would testify, and she assumed she would testify on her own behalf. She recalled, however, that the night before the last day of her trial, Counsel told her he was not going to call her to testify because she was "too emotional" to testify, and she "wouldn't do [herself]

20

any good." The Petitioner testified that the next day, when the trial court asked her if her decision to not testify was voluntary, she told the trial court the decision was her own because she did not want to "make [her] lawyer mad." She testified that, had she testified at her trial, she would have said she did not kill her ex-husband and had "no idea what happened to him." In reference to Counsel's representation, the Petitioner testified, "I don't feel like [Counsel] did anything I asked him to [do]."

On cross-examination, the Petitioner acknowledged that she was present during the pre-trial hearing wherein venue was discussed and that she said nothing when Counsel told the court they wished to try the case in Van Buren County.

The Petitioner acknowledged she had no reason to believe Counsel did not contact the witnesses she suggested he contact. She said she felt that, if Counsel had pressed her sister further, her sister would have testified on her behalf at trial. The Petitioner said she felt Counsel should have obtained expert analysis of a fingerprint found on a compact near the victim's body and DNA analysis of a cigarette found near the victim's body. She acknowledged, however, that she did not have funds to cover such analysis. She acknowledged that many people searched for the victim's body and that, as a consequence, the cigarette could have belonged to one of these people rather than the victim's killer.

The Petitioner testified she was unhappy with Counsel's representation, in part, because of his unprofessional conduct: she claimed he spoke to her during trial of his sexual attraction to women who were present in the court room. When the trial judge, who also presided over the Petitioner's trial, commented that he observed the Petitioner and Counsel appear to get along, the Petitioner explained that she was "scared to death" and did not understand she could request the court to appoint another attorney.

Patsy McCormick, one of the Petitioner's sisters, testified that she was present at the court house during her sister's trial and that she was prepared to testify, though she was never called as a witness. She said that, had she taken the stand, she would have testified that, when she visited her sister during her hospitalization, she never heard her sister make any incriminating statement. She also would have testified that she, along with several other people, were searching for the victim's body near a "burn hole" behind his and the Petitioner's home when they found a charred couch and charred bits of clothing. She testified that, during this same search, she found a wire net, identical to the one found a few days later covering the victim's body, on the back patio of the home.

Gail Potter, another of the Petitioner's sisters, testified that she also participated in the search for the victim and of the Petitioner's home and that, while doing so, she noticed that the sheets on the Petitioner's bed had an animal print. Later, during trial, she heard testimony

21

that the flower-print sheet found with the victim's body matched the sheets on the Petitioner's bed. Realizing that this could not be true given her observation, she told Counsel she wished to testify and expose this discrepancy. She testified Counsel told her she would not be a credible witness because she was the Petitioner's sister.

Angelia Shockley testified that she was a reporter for the Van Buren County newspaper at the time of the Petitioner's trial and that she interviewed the Petitioner between her trial and her sentencing hearing. She testified that despite initially giving her permission to interview the Petitioner, Counsel did not allow her to publish the details of her interview with the Petitioner. Ms. Shockley said Counsel made romantic advances to her during the course of their interaction. She recalled, "On breaks when I would speak to him and say when can I speak with [the Petitioner] or something like that, it was always extra compliments he paid to me."

Diana Powell testified that she was the Petitioner's personal friend and that the Petitioner started cleaning Ms. Powell's house around 1995. She recalled that, before trial, she contacted Counsel attempting to offer her testimony in support of the Petitioner but that she was never able to speak with him. She testified that, had she been called as a witness, she would have testified that the Petitioner may have had a bottle of bleach in the trunk of her car because she commonly asked the Petitioner to pick up a bottle of bleach on the way to clean her house. Ms. Powell also would have testified that the Petitioner did not like to touch the victim's guns. On cross-examination, Ms. Powell acknowledged the Petitioner stopped cleaning her home in October of 2003.

Mary Webb, the Petitioner's neighbor when the Petitioner lived at the home she shared with the victim, testified that she spoke over the phone with Counsel one time about the Petitioner's case but did not recall their conversation. She testified that she was willing to testify in support of the Petitioner. Ms. Webb said she would have testified to the following at trial: that she knew the Petitioner to experience extreme abdominal pain when she attempted to move heavy objects; that the victim and the Petitioner always maintained a "burn pile" behind their home; and that she had seen the Petitioner use bleach to clean their dog's blood from the porch once when the dog had been injured.

The Petitioner introduced a signed statement from Chief Deputy Barney Evans of the Van Buren County Sheriff's Department. In this statement, Deputy Evans said he saw the victim alive on the Tuesday before the victim was reported missing on Thursday.

At the conclusion of the hearing, the trial court made several findings of fact and conclusions of law as to the Petitioner's claims. Ultimately, it concluded that the Petitioner failed to demonstrate that Counsel's representation was ineffective, and it denied the

Petitioner's petition for post-conviction relief.  It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner claims that the post-conviction court improperly denied relief in this case based on the Petitioner's claim of ineffectiveness of counsel because Counsel: (a) failed to move for a change of venue; (b)  failed to properly investigate the Petitioner's case by not furnishing a jury list to the Petitioner, not timely subpoenaing witnesses, and not allowing the Petitioner to review the evidence before trial; © improperly advised the Petitioner against testifying and thereby failed to present a defense; (d) failed to challenge jurors Vivian Measles and Allen Bouldin; and (e) failed to present the testimony of the Petitioner's sisters and Van Buren County Deputy Barney Evans, whose testimony the Petitioner argues would have supported the Petitioner's innocence.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006).  The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence.  T.C.A. § 40-30-110(f) (2006).  Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997).  A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001).  A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id*. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975).  The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment.   Second, the [petitioner] must show that the deficient

performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a Petitioner in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n. 38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard,

then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. Venue

The Petitioner contends Counsel was ineffective because he failed to move for a change of venue despite extensive pre-trial publicity and the Petitioner's misgivings about being tried in Van Buren County. The State responds that, based upon Counsel's testimony at the post-conviction hearing that the Petitioner wanted the trial to be held in Van Burne County, the record supports the trial court's denial of this claim.

In this case, the trial court found that Counsel's decision to forego a change of venue was based on his belief, which he stated before trial, that "people [in Van Buren County] would like [the Petitioner] just as much if not more than [the victim]." The trial court discredited the Petitioner's statement that she was "dead set" against standing trial in Van Buren County.

Based on Counsel's testimony, which the trial court was entitled to credit, the Petitioner told Counsel she wished to be tried in Van Buren County because she believed its citizens knew the victim abused her and would, therefore, be sympathetic to her. Thus, the record does not preponderate against the post-conviction court's finding that Counsel's decision not to pursue a change of venue was based on the Petitioner's belief that the people of Van Buren County would provide a favorable jury venire. *See Fields*, 40 S.W.3d at 456-57. We conclude that, in light of this belief, Counsel's decision to forego a change of venue was a strategic maneuver to obtain a favorable jury and, thus, did not amount to deficient performance. *See House*, 44 S.W.3d at 515. The Petitioner is not entitled to relief on this issue.

## B. Investigation

The Petitioner next contends Counsel was ineffective for failing to properly investigate her case by timely subpoenaing evidence and witnesses. The State responds that the evidence supports the trial court's findings that Counsel thoroughly searched for all witnesses with relevant information.

The trial court found that Counsel adequately investigated the facts and evidence in

this case and that he interviewed all witnesses who had information most likely to affect the jury's verdict. The trial court noted that it had presided over the Petitioner's trial and that, based on what he observed, no difficulty or animosity appeared to exist between the Petitioner and Counsel regarding Counsel's representation.

The record shows that Counsel extensively met with members of the Van Buren County community in order to understand the dynamics of the community and that he followed every possible lead the Petitioner provided. Counsel also met extensively with members of the Petitioner's family, including her daughter and her sisters. He explored several alternative defense theories, and he discussed these theories with the Petitioner. In all, Counsel spent "hundreds" of hours in preparation for the Petitioner's trial. Although the Petitioner argued at the post-conviction hearing that Counsel should have obtained expert forensic analysis of fingerprint and DNA evidence collected from items located near the victim's body, the Petitioner provided Counsel with no funds to do so. Even had such analysis been performed, the record is clear that the analysis would have had little or no exculpatory value. Furthermore, the Petitioner failed at the post-conviction hearing to present the forensic analysis she claims Counsel should have performed and, therefore, failed to satisfy her burden of proving prejudice.

In sum, the record does not preponderate against the trial court's finding that the Petitioner investigated the case and interviewed all witnesses with potentially relevant information. *See Fields*, 40 S.W.3d at 456-57. Therefore, we conclude that Counsel's efforts to investigate the case fell within the "wide range of reasonable professional assistance." *See Burns*, 6 S.W.3d at 462. The Petitioner is not entitled to relief on this issue.

### C. Juror Challenges

The Petitioner argues Counsel was ineffective because he did not provide her with a jury list or challenge Jurors Measles and Bouldin. The State responds that the trial court credited Counsel's testimony that the Petitioner only informed him of her objections to these jurors after trial and that, as such, his failure to challenge them did not constitute ineffective assistance. The State also argues that the Petitioner fails to establish prejudice from these jurors' inclusion on her jury.

At the conclusion of the post-conviction hearing, the post-conviction court noted that it credited Counsel's testimony over that of the Petitioner. Counsel testified that, during jury selection, he was not aware of any information that would make either Juror Measles or Juror Bouldin unqualified or biased as a jury member. He testified that only after trial, when he was putting together the motion for new trial, did the Petitioner request that he include an objection to the two jurors' inclusion on her jury. He reiterated that, during jury selection,

the Petitioner never informed him of anything objectionable about the jurors or expressed concerns over any connections they had to parties involved in the case. At the post-conviction hearing, the Petitioner testified that, during jury selection, she informed Counsel that Juror Measles had previously worked with the victim's nephew and that Juror Bouldin's son was a Van Buren County jailer. She claimed that, based on these relationships, she asked Counsel to strike these jurors from her jury. The trial court, as the finder of fact, is best able to determine the credibility of witnesses. Thus, we will not reweigh or reevaluate the trial court's rejection of the Petitioner's version of events. *See Momon*, 18 S.W.3d at 156. Thus, the record shows that Counsel was unaware of any information indicating that the jurors in issue were unqualified to sit on the Petitioner's jury and only became aware of the Petitioner's objection to the jurors after trial. As such, inclusion of Jurors Measles and Bouldin on the jury did not constitute deficient performance. The Petitioner is not entitled to relief on this issue.

### D. Decision to Present no Evidence & to Refrain from Calling the Petitioner to Testify

The Petitioner contends Counsel was ineffective because he chose to present no evidence and because he did not call the Petitioner to testify in her own defense. The State responds that the evidence shows that overwhelming circumstantial proof showed the Petitioner's guilt and that the trial court credited Counsel's testimony that the Petitioner herself did not want to testify in her own defense.

The post-conviction court recalled that the Petitioner's case was unusual in that "a lot of circumstantial evidence" indicated the Petitioner was guilty of her ex-husband's murder. It found that Counsel's decision to present no evidence was reasonable and strategic, based upon the largely circumstantial nature of the State's case against the Petitioner. The trial court noted that presenting evidence may have been beneficial had a witness existed who would testify that a third party admitted to the killing but that no such witness existed. The trial court found that the statements the Petitioner made in the hospital were "very damaging" to her case. It concluded that the Petitioner failed to demonstrate that, had Counsel chosen a different course of action, the result of her trial would have been different.

The post-conviction court recalled that it thoroughly reviewed with the Petitioner her waiver of the right to testify and that the Petitioner calmly confirmed that she was waiving her right to testify voluntarily. The trial court also noted that, had the Petitioner testified, she undoubtedly would have had to face "difficult questions" from the State regarding the wealth of circumstantial evidence implicating her in her ex-husband's death. It concluded that the Petitioner failed to demonstrate that Counsel coerced her into waiving her right to testify.

We agree that the evidence introduced in the Petitioner's trial, though strongly suggestive of the Petitioner's guilt, was largely circumstantial: The Petitioner and the victim divorced in May 2005 but, as of June 2005, they continued to dispute the division of their marital home. On June 5, 2005, the victim and the Petitioner were seen leaving the home together. Later on the same day, around twenty-five gunshots were heard coming from behind their home. After this, the Petitioner was seen leaving the home alone, driving the victim's truck. In the following days, the Petitioner made multiple trips to area stores and gas stations to buy cleaning supplies and gasoline. She gave varying, contradictory accounts of her ex-husband's whereabouts. Also during this time, the Petitioner burned a couch on the burn pile behind the marital home. On June 9, 2005, the Petitioner attempted suicide. While in the hospital recuperating from her suicide attempt, the Petitioner, who was under the influence of several medications, spoke about the victim being shot and about being bitten by a snake. A few days later, charred remnants of the victim's clothing were found beneath the couch the Petitioner planned to burn on the burn pile, and the victim's body was found a short distance away in a brush pile. A dead snake rested on top of this brush pile. The victim was determined to have died as a result of multiple gunshot wounds, and a bullet found beneath the victim's body was determined to have been fired from a rifle found in the marital home. The State's proof included neither an eye witness to the victim's shooting, an admission of guilt from the Petitioner, nor any forensic proof excluding all but the Petitioner as the victim's shooter. Thus, the State's evidence was largely circumstantial.

Counsel testified that he chose not to present evidence in order to emphasize that, in his view, the State had failed to prove beyond a reasonable doubt that the Petitioner killed the victim. In our view, taking into account the largely circumstantial nature of the proof tending to establish the Petitioner's guilt, Counsel's defense strategy of drawing the jury's attention to the State's lack of direct evidence was a reasonable trial strategy. *See House*, 44 S.W.3d at 515. The ultimate failure of Counsel's chosen strategy does not constitute ineffective assistance of counsel. *Id*.

Further, Counsel testified that the Petitioner was consistently unwilling to testify in her defense. He testified that she had refused from the outset to testify and that she became increasingly opposed to testifying as trial progressed. Counsel testified that he believed the Petitioner would have been well-served to testify but that he could not convince his client of this fact. The post-conviction court credited Counsel's testimony, and we defer to the post-conviction court's credibility determinations. *See Momon*, 18 S.W.3d at 156. Therefore, in spite of the Petitioner's insistence that she wished to testify but was barred from doing so by Counsel, we conclude that the record does not preponderate against the post-conviction court's finding that the Petitioner at trial did not wish to testify in her own defense. Thus, we conclude that Counsel's conduct did not fall below an "objective standard of reasonableness" when he honored this wish and did not call the Petitioner to testify in her

28

own defense. *See House*, 44 S.W.3d at 515. As such, his representation was not deficient in this regard, and the Petitioner is not entitled to relief on this issue.

### E. Failure to Present Testimony of "Numerous" Witnesses

The Petitioner argues that counsel was ineffective for failing to call "numerous witnesses" whose testimony she argues would have created a "viable defense." First, she argues her sisters would have testified they did not hear the Petitioner make any inculpatory statement while she was in the hospital. Second, she argues Ms. McCormick would have testified that, while the victim was hospitalized, she saw the net later found on the victim's body on the porch of the Bryants' home. Third, the Petitioner argues Sheriff Evans would have testified he saw the victim alive on Tuesday, the day after the State alleged that the Petitioner burned the couch on the burn pile. The State responds that none of the testimony cited by the Petitioner undermines the overwhelming proof that the Petitioner killed the victim. As a consequence, the State argues, the Petitioner has failed to show prejudice caused by Counsel's failure to present the testimony of the witnesses at issue.

The post-conviction court made several findings related to the probative value of the testimony the Petitioner argued Counsel failed to present at trial: it found that Ms. Powell's testimony that the Petitioner had a legitimate use for the bleach did not "necessarily prove anything" about the Petitioner's innocence. Furthermore, it found that the testimony of the Petitioner's sisters, Ms. Webb, and Ms. Potter all lacked credibility and that, in any case, each individual's testimony would not have changed the outcome of trial.

We note again that the post-conviction court was entitled to discredit the testimony elicited from the Petitioner's sisters at the post-conviction hearing and that we will not re-evaluate this credibility determination on appeal. *See Momon*, 18 S.W.3d 152, 156. Conversely, the post-conviction court was entitled to credit, as it did, Counsel's testimony that the Petitioner's sisters were, in one instance, unwilling to testify in support of the Petitioner and, in another instance, unreliable. *See id*. As a threshold matter, the lack of credibility of the witnesses offered at the post-conviction hearing was fatal to the Petitioner's burden of producing credible testimony, which, if offered at trial, would have resulted in a different outcome for the Petitioner. Furthermore, Counsel explained at the post-conviction hearing that he had specific reasons for choosing not to subpoena the Petitioner's sisters to testify in her case: one did not want to testify, and the other was unreliable. Thus, even were we to take the witnesses' testimony as true, because the testimony had limited probative value, Counsel's decision to forego presenting the testimony was within the "wide range of reasonable professional assistance" expected of criminal defense attorneys. *See Burns*, 6 S.W.3d at 462. Having failed to prove both deficient performance and prejudice, the Petitioner is not entitled to relief on this issue.

## III. Conclusion

After a thorough review of the record and applicable law, we conclude the Petitioner failed to establish that she received the ineffective assistance of counsel at trial. As such, we affirm the post-conviction court's judgment denying relief in this case.

_____

ROBERT W. WEDEMEYER, JUDGE